**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES, LLP**
HELEN I. ZELDES (SBN 220051)
*hzeldes@sshhzlaw.com*
AMY JOHNSGARD (279795)
*ajohnsgard@sshhzlaw.com*
AYA DARDARI (SBN 344039)
*adardari@sshhzlaw.com*
501 W. Broadway, Suite 800
San Diego, CA 92101
Tel: (619) 400-4990

**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES, LLP**
JOSHUA A. FIELDS (SBN 242928)
*jfields@sshhzlaw.com*
9415 Culver Blvd., #115
Culver City, CA 90232-2616
Tel: (619) 400-4990

*Counsel for Plaintiff Kristen Kohler and the Proposed Class.*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## SAN DIEGO DIVISION

| | |
|---|---|
| KRISTEN KOHLER, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>WHALECO, INC., a Delaware Corporation, d/b/a Temu; and DOES 1-10,<br><br>Defendants. | Civil Case No.: **'24 CV 0935 BEN DEB**<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1      Plaintiff Kristen Kohler ("Kohler" or "Plaintiff"), individually and on behalf

2 of all others similarly situated, by and through her counsel, brings the following

3 Complaint against Defendant WhaleCo, Inc. d/b/a Temu ("Defendant" or "Temu")

4 and DOES 1-10.

5               **I.    NATURE OF THE ACTION**

6     1.    Defendant operates the online megastore www.Temu.com that sells a

7 myriad of merchandise categories, including but not limited to women's and men's

8 clothing, beauty and health products, home and kitchen products, sports and

9 outdoors products, appliances, tools and home improvement products, pet supplies,

10 and toys and games, on its e-commerce retail store, Temu.com, and its downloadable

11 Application to consumers throughout California and the United States.

12     2.    Defendant lures consumers to its Temu website by promising the

13 opportunity to "shop like a billionaire."

14
15
16
17 
18
19
20
21

22     3.    Defendant creates the illusion of "shopping like a billionaire" by

23 employing "false reference pricing" to lure consumers into believing they are

24 purchasing items at a discounted price. To do so, for each item it sells, Defendant

25 lists a decoy "discounted" sale price (the "Discounted Price") and a slashed through,

26 higher, and completely fabricated price for the consumer's comparison (the

27 "Reference Price"). The resulting sham price disparity deliberately misleads

28

---

CLASS ACTION COMPLAINT

consumers into believing they are receiving a bargain and induces them to purchase the product.

4.      In reality, by artificially raising the Reference Price, and with it the value ascribed to these products by consumers, this practice inflates the true market price for these items.  Retailers drastically benefit from employing false reference pricing schemes and experience increased sales because consumers use advertised reference prices to make purchase decisions.  Consumers frequently lack full information about the true retail value of a product and, as a result, rely on representations made by sellers to make purchase decisions.

5.      For example, pictured below is a screenshot of the Temu advertisement for "3pcs Boys Girls Bowknot Red Plaid Comfy Shorts":



CLASS ACTION COMPLAINT

The product is advertised to have a Reference Price of $63.99 and an alleged Discounted Price of $8.99, implying a discount of 85% (the "Highlighted Discount").

6.      Defendant misrepresents the existence, nature, and amount of price discounts on products sold on its website by purporting to offer discounts from a falsified Reference Price. As addressed in detail below, Plaintiff and other reasonable consumers typically understand the Reference Price to be the former, original, or regular retail price of the item accompanying the item's image and description.

7.      Defendant advertises next to the product descriptions of its merchandise on the Temu website Reference Prices which are overstated and do not represent a bona fide price at which the products were previously sold. Nor are the advertised Reference Prices prevailing market retail prices within three months immediately preceding the publication of the advertised former prices, as required by California law.

8.      Based upon the difference between the Reference Price and the Discounted Price, Plaintiff believed, and reasonable consumers would believe, that the Discounted Prices represent bona fide discounts on true former Temu prices or a true market retail price. However, the claimed Reference Prices are a sham.

9.      Defendant makes no effort to verify that the Reference Prices displayed on its Temu website are tied to either actual prices at which the goods were previously sold on Temu or at which they are sold anywhere else in the retail market. The Reference Prices and the false Discounted Prices constitute advertisements under California law. Indeed, the coupling of the Reference Price with the purported Discounted Price makes a statement to the public as to the existence of a price discount—the percentage of which Temu prominently highlights in a colored box next to the false Reference Price—and promotes the purchase on that basis.

10.    The Reference Prices listed on Defendant's Temu website do not represent a former price at all—much less a prevailing market price in the preceding three months. Nor is it a price at which principal retail outlets were selling the product at a substantial volume in the regular course of business across a substantial number of representative communities. Rather, the Reference Prices are fictional amounts intentionally displayed so Defendant can advertise fake markdowns and "bargains." The entire price display—indeed the entire discount megastore motif—is designed to dupe consumers into believing they are buying main line retail products at reduced prices.

11.    This impression of quality is buoyed by Defendant's declarations next to the prices of Plaintiff's purchases such as "#1 new arrival in makeup bag" and "#11 best provider in beauty tools." In fact, consumers are buying lower quality merchandise that was never offered or sold as genuine quality clothing, accessories, and other goods. By designing its pricing information in this way, Temu intended to deceive reasonable consumers including Plaintiff.

12.    The rapid growth of Temu underscores the insidiousness and efficacy of Defendant's sham pricing schemes. Defendant launched its Temu e-commerce platform in the United States in September 2022.[1] The following year, Defendant expanded the platform by launching in Australia,[2] New Zealand,[3] France, Germany, Italy, the Netherlands, Spain, and the United Kingdom.[4]  The early 2023 European

---

[1] Temu Marketplace Launches in the U.S., *available at* https://www.marketplacepulse.com/articles/temu-marketplace-launches-in-the-us#:~:text=Since%20Temu%20launched%20in%20the,in%20bulk%20to%20Temu's%20warehouses, last accessed April 22, 2024.
[2] China-backed shopping app that could unseat Kmart, Big W, *available at* https://www.news.com.au/lifestyle/real-life/news-life/chinabacked-shopping-app-that-could-unseat-kmart-big-w/news-story/2d37619c6237afd46895ad004062f6c2, last accessed April 22, 2024.
[3] *Ibid*.
[4] PDD's Temu opens shop in Europe with 6 new markets as it rapidly expands to take on rivals Shein, ByteDance, *available at* https://www.scmp.com/tech/big-tech/article/3218124/pdds-temu-opens-shop-europe-six-new-markets-it-rapidly-expands-take-rivals-shein-bytedance, last accessed April 22, 2024.

launch of Temu generated what has been described as a "meteoric rise in traffic and sales in Europe."[5] In 2024, Defendant expanded to South Africa.[6]

13.    In 2023, Defendant posted a year-on-year net profit jump of over 90 percent to $8.3 billion, with annual sales reaching $34.4 billion.[7] That same year, Defendant surpassed 100 million active users in the United States, over 130 million application downloads globally, and approximately 420 million monthly website visits.[8]

14.    While enjoying 10-figure profits, Defendant was investigated by the United States House Select Committee on the Chinese Communist Party. The Committee's June 2023 report found that Defendant had built an empire around a loophole allowing it to evade complying with the Uyghur Forced Labor Protection Act ("UFLPA") and other prohibitions on forced labor.[9]  The UFLPA was enacted in response to the People's Republic of China's detention of more than one million Uyghur and other primarily Muslim minorities in China's far western Xianjiang Uyghur Autonomous Region where an estimated 100,000 Uyghurs may be working in forced labor camps.[10]  The report revealed Defendant was taking advantage of a U.S. shipping provision that allows them to avoid tariffs on orders and to

---

[5]  Similarweb, 'Temu: Analyzing Europe's Ecommerce Rising Star' (December 2023, accessed on 2 May 2024).
[6]  Zando launches international unit to counter Shein and Temu in South Africa, *available at* https://www.reuters.com/business/retail-consumer/zando-launches-international-unit-counter-shein-temu-south-africa-2024-04-18/#:~:text=Temu%20launched%20in%20South%20Africa,Zando%20said%20in%20a%20statement, last accessed April 22, 2024.
[7]  Temu Owner Pinduoduo Nearly Doubles Annual Profit, *available at* https://www.barrons.com/articles/temu-owner-pinduoduo-nearly-doubles-annual-profit-c7790e5d, last accessed April 22, 2024.
[8]  Temu Revenue and Usage Statistics (2024), *available at* https://www.businessofapps.com/data/temu-statistics/, last accessed April 22, 2024.
[9]  Select Committee Releases Interim Findings from Shein & Temu Forced Labor Investigation, *available at* https://selectcommitteeontheccp.house.gov/media/press-releases/select-committee-releases-interim-findings-shein-temu-forced-labor, last accessed April 22, 2024.
[10]  Against Their Will: The Situation in Xianjiang, *available at* https://www.dol.gov/agencies/ilab/against-their-will-the-situation-in-xinjiang, last accessed April 22, 2024.

1  "circumvent" the UFLPA.[11] Indeed, Defendant admitted it "does not expressly
2  prohibit third-party sellers from selling products based on their origin in the Xinjiang
3  Autonomous Region."[12]

4      15.    In February 2024, Defendant ran multiple Super Bowl ads, leading to a
5  spike in searches for its name and online traffic.[13] Defendant's Temu application
6  vaulted to second place among the most downloaded free applications on Apple
7  devices.[14]



19      16.    Defendant's expansion has also sparked warnings from government
20  officials about the Temu application harvesting consumers' personal data.[15] A class

---

[11] https://globalaffairs.org/bluemarble/how-shein-and-temu-get-around-us-labor-laws-ban-products-made-forced-labor, last accessed May 22, 2024.
[12] *Supra*, note 8.
[13] What is Temu? What we know about the e-commerce company with multiple Super Bowl ads, *available at* https://www.usatoday.com/story/money/2024/02/12/what-is-temu-super-bowl/72573203007/, last accessed April 22, 2024.
[14] What is Temu, the company made famous in Super Bowl ads?, *available at* https://abcnews.go.com/Business/what-is-temu-company-in-super-bowl-ads/story?id=107159833, last accessed April 22, 2024.
[15] Chinese shopping app Temu could be harvesting phone users' data according to report, *available at* https://www.thisismoney.co.uk/money/markets/article-12578631/Warning-Chinese-shopping-app-Temu-harvests-data.html, last accessed April 22, 2024.

action complaint filed in Illinois in November 2023 alleges the Temu application deploys the "most dangerous" spyware in circulation, allowing Defendant to gain access to "literally everything on your phone" once the application is downloaded.[16] In May 2024, the European Consumer Organization BEUC filed a complaint alleging Temu's online marketplace fails to comply with the EU Digital Services Act (EU Regulation 2022/2065) after 17 companies accused it of "manipulative practices" and lack of transparency.[17]

17.    Like these other questionable and allegedly unlawful business practices, Defendant's false reference pricing scheme allows it to take advantage of the consuming public.

18.    Plaintiff thus brings this action pursuant to: (i) California's Business & Professions Code §§ 17200, *et seq.* (the Unfair Competition Law or "UCL"); (ii) California's Business and Professions Code §§ 17500, *et seq.* (the False Advertising Law or "FAL"); and (iii) California Civil Code §§ 1750, *et seq.* (the Consumer Legal Remedies Act or "CLRA"). Plaintiff brings this action on behalf of a California class for damages, restitution, and injunctive relief, and any other relief deemed appropriate by the court to which this case is assigned.

## II.    JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d), as Plaintiff (California) and Temu (Delaware) are diverse, there are over 100 class members, and the amount in controversy exceeds $5 million.

20.    This Court has personal jurisdiction over Defendant because Defendant is a corporation or other business entity authorized to conduct and does conduct business in the State of California. Defendant conducts sufficient business with

---

[16] *Ziboukh v. Whaleco, Inc.*, Case No. 1:23-cv-15653 (N.D. Ill.), Docket No. 1, ¶¶ 5, 7 (filed 11/03/23).
[17] https://news.sky.com/story/temu-faces-legal-challenge-over-manipulative-practices-13136498, last accessed May 22, 2024.

sufficient minimum contacts in California, and/or otherwise intentionally avails itself of the California market through its promotion, sales, distribution, and marketing within this State to render the exercise of jurisdiction by this Court permissible.

21.    Venue is proper under 28 U.S.C. § 1391(b)(2) because Defendant transacts substantial business in this District. A substantial part of the events giving rise to Plaintiff's claims arose here.

### III.    PARTIES

22.    Plaintiff Kristen Kohler is, and at all times mentioned herein was, an individual citizen of the State of California and resident of San Diego County. On or about February 24, 2024, she purchased seven items through the Temu website that were labeled with false, deceptive, and/or misleading Reference Prices. The marked Reference Prices for the products Kohler purchased from Temu were not former prices at all. Similarly, they were neither prevailing market prices in the preceding three months, nor actual prices at which significant sales of those products were made at other retail stores. Plaintiff purchased these products in reliance on Defendant's false, deceptive, and misleading advertising, marketing, and pricing schemes, which she would not otherwise have purchased absent those schemes. Kohler has lost money and/or property and has been damaged as a result.

23.    Plaintiff would like to buy Defendant's products in the future, if and when they are sold without an artificially inflated pricing scheme. She can no longer rely on the accuracy of the Reference Prices and Highlighted Discounts in deciding whether to purchase products on Temu.

24.    Defendant WhaleCo Inc. d/b/a Temu is a Delaware business corporation with its principal place of business in Massachusetts, doing business in all 50 States and the District of Columbia.

25.    Plaintiff does not know the true names or capacities of the persons or entities sued herein as DOES 1-10, inclusive, and therefore sues such defendants by

1 such fictitious names. Plaintiff is informed and believes, and upon such information
2 and belief alleges, that each of the DOE Defendants is in some manner legally
3 responsible for the damages suffered by Plaintiff as alleged herein. Plaintiff will
4 amend this Complaint to set forth the true names and capacities of these Defendants
5 when they have been ascertained, along with appropriate charging allegations, as
6 may be necessary.

## IV.    FACTUAL ALLEGATIONS

26.    On or about February 24, 2024, Plaintiff purchased the following seven
items from the Temu website based on the advertised Reference Prices:

| Item | Reference Price | Listed Discount Price | Listed Highlighted % Discount | Final Purchase Price |
|---|---|---|---|---|
| Simple Chenille Letter Makeup Zipper Bag | $46.99 | $6.77 | 85% | $6.97 |
| Face Wash Foam Maker Facial Cleanser | $2.99 | $2.24 | 25% | $2.47 |
| 3 pcs Boys Girls Bowknot Red Plaid Comfy Shorts | $63.99 | $8.99 | 85% | $8.99 |
| Cute Rainy Cloud Earrings Drop Oil Ear Jewelry | $12.00 | $1.79 | 85% | $1.79 |
| Hawaii Print Crew Neck T-Shirt, Casual Short | $21.99 | $8.99 | 59% | $8.09 |
| 6 Pairs/Set Pink Butterfly Duck Dice Pin Lollipop Earrings | $9.99 | $2.48 | 75% | $1.99 |
| 1 Set Mini Earring Holder, Hanging Acrylic Earrings | $11.69 | $2.67 | 77% | $2.58 |
| Totals | $169.64 | $33.93 | | $32.88 |

**Temu Makes Consistent Use Of Reference Prices**

In the pricing display for each item sold on the Temu website, consumers are clearly
presented in bold black type with the Discount Price, the struck-through Reference
Price, and a purported Highlighted Discount—displayed in a bright orange box and

determined using the item's Reference Price and the Discount Price. This pricing display does not clearly indicate what the struck-out Reference Price means. Consumers are not in any readily observable way presented with how Defendant devised the Temu Reference Prices. The consumer relies on the Reference Price and is led to believe that they are actually saving the difference between the sale and Reference Price as indicated by the Highlighted Discount. *See e.g.*, ¶ 5, *supra*.

27.     Defendant's pricing scheme sets up consumers to compare the prices of Temu's products with the advertised higher Reference Prices, which Defendant leads consumers to believe were either previously charged by Temu or were charged by other merchants for the same products. Temu reinforces this perception by including in its pricing information a Highlighted Discount that can only be interpreted by the consumer to be the percentage discount they are supposedly enjoying when making the purchase.

**Reference Prices Are Material to Consumers**

28.     The misleading comparison pricing employed by Defendant—where a retailer contrasts its selling price for a product with a much higher reference price— has become common in the retail market.

29.     Retailers like Defendant have increasingly employed comparative reference pricing. The Reference Prices are often accompanied by short tag-line phrases such as "former price," "regular price," "list price," "MSRP," or "compare at."   These marketing phrases are commonly referred to as "semantic cues." Consumers are so accustomed to this scheme that they believe they understand that the struck-through Reference Prices accompanied by the purported percentage discounts represent a bona fide discount offered by the retailer.

30.     Marketing research conducted over the last four decades unanimously concludes that comparative reference prices are material to consumers and influence their purchasing decisions.

31.    One such oft-cited study by Dhruv Grewal & Larry D. Campeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. of Pub. Pol'y & Mktg., 52, 55 (Spring 1992) concludes that "[b]y creating an impression of savings, the presence of a higher reference price enhances [consumers'] perceived value and willingness to buy [a] product." In other words, comparative reference prices lead consumers to believe they are getting a bargain, which increases their willingness to make purchases.

32.    The finding that "advertised reference prices do indeed enhance consumers' perceptions of the value of the deal" was echoed by a 2022 study published by Compeau & Grewal in *Comparative Price Advertising: Believe It Or Not,* J. of Consumer Affairs, Vol. 36, No. 2, at 287 (Winter 2002), citing "decades of research." Notably, Compeau & Grewal also conclude that "[c]onsumers are influenced by comparison prices even when the stated reference prices are implausibly high." *Id.*[18]

33.    Even more recently, a 2011 study concluded that, "[r]eference price ads strongly influence consumer perceptions of value. . . . Consumers often make purchases not based on price but because a retailer assures them that a deal is a good bargain. This occurs when . . . the retailer highlights the relative savings compared with the prices of competitors . . . [T]hese bargain assurances (BAs) change consumers' purchasing behavior and may deceive consumers."   Joan Lindsey-

---

[18] *See also*, Praveen K. Kopalle & Joan Linsey-Mullikin, *The Impact of External Reference Price On Consumer Price Expectations,* 79 J. of Retailing 225 (2003), ( "research has shown that retailer-supplied reference prices clearly enhance buyer's perceptions of value" and "have a significant impact on consumer purchasing decisions.") and Dr. Jerry B Gotlieb & Dr. Cyndy Thomas Fitzgerald, *An Investigation Into the Effects of Advertised Reference Prices on the Price Consumers Are Willing to Pay For the Product*, 6 J. of App'd Bus. Res. 1 (1990) ("reference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product." Further, "consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price.").

Mullikin and Ross D. Petty, *Marketing Tactics Discouraging Price Search: Deception and Competition*, 64 J. of Bus. Research 67 (January 2011).

34.   As has been abundantly demonstrated in marketing research, not only are reference prices material to consumers' decisions to make purchases, but an artificially high reference price can also inflate the price a consumer is willing to pay for an item, even when the reference price is implausibly high.

**Defendant Has a Legal Duty to Use Substantiated, Bona Fide Reference Prices**

35.   The FTC Online Advertising Disclosure Guidelines require advertisers to "have evidence to back up their claims ('substantiation'). . . Before disseminating an ad, advertisers must have appropriate support for all express and implied objective claims that the ad conveys to reasonable consumers. When an ad lends itself to more than one reasonable interpretation, there must be substantiation for each interpretation. The type of evidence needed to substantiate a claim may depend on the product, the claims, and what experts in the relevant field believe is necessary." Fed. Trade Comm'n, *.com Disclosures: How to Make Effective Disclosures in Digital Advertising* (2013).[19]

36.   Defendant does not have sufficient evidence to substantiate the validity of its Reference Prices.

37.   From the consumer's point of view, it is unclear what the struck-through Reference Price is supposed to represent. It could be any of the following: 1) a price at which the item was formerly sold at through Temu; 2) a price at which the exact item was sold in the retail market; 3) a price at which a similar item was sold in the retail market; or perhaps 4) a manufacturer's suggested retail price ("MSRP"). In any event, Defendant has not met its burden of price substantiation.

---

[19]   https://www.ftc.gov/system/files/documents/plain-language/bus41-dot-com-disclosures-information-about-online-advertising.pdf.

**a) The Law Regarding Advertising Comparisons to Former Prices**

38.    To the extent the Reference Prices listed by Defendant on the Temu website imply they are Defendant's own former prices for the products, the FTC requires the former price be the "actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time" for it to provide a "legitimate basis for the advertising of a price comparison." But if the "former price being advertised is not bona fide but fictitious—for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction—the 'bargain' being advertised is a false one; the purchaser is not receiving the unusual value he expects. In such a case, the 'reduced' price is, in reality, probably just the seller's regular price."  10 C.F.R. § 233.1(a).

39.    For a former price to be legitimate, the price must be "one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith— and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based." 10 C.F.R. § 233.1(b).

40.    Under California's FAL, Section 17501, this requirement is similar, but more specific. "No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement." Cal. Bus. & Prof. Code § 17501.

41.    If Defendant is advancing a former pricing scheme—*i.e.*, if Defendant alleges that the struck-through Reference Prices are prices at which Defendant formerly listed those items on the Temu website—then Defendant has a legal obligation to verify that each item's Reference Price was indeed a former price at which Temu offered that item for sale withing the preceding three months.

42.    Defendant does not have such evidence and has not in fact verified that its Reference Prices were former prices at which Temu offered its items for sale withing the preceding three months.  *See* Cal. Bus. & Prof. Code § 17501.

**b) The Law Regarding Advertising Comparisons to the Pricing of Identical Products**

43.    As with comparisons to their own former prices, the FTC Pricing Guides provide rules for merchants who compare the price of their goods to the prices at which identical items are sold by other vendors. *See* 16 C.F.R. § 233.2(a) ("Another commonly used form of bargain advertising is to offer goods at prices lower than those being charged by others for the same merchandise in the advertiser's trade area (the area in which he [sic] does business).")

44.    The FTC Pricing Guides require that when merchants such as Temu use advertising that compares their prices to higher reference prices for the same merchandise, "the advertised higher price must be based on fact, and not be fictitious or misleading." *Id.* Specifically, the FTC Pricing Guides state:

> Whenever an advertiser represents that he is selling below the prices being charged in his area for a particular article, he should be reasonably certain that the higher price he advertises does not appreciably exceed the price at which substantial sales of the article are being made in the area - that is, a sufficient number of sales so that a consumer would consider a reduction from the price to represent a genuine bargain or saving.

*Id.*

45.    If Temu is advancing a comparative pricing scheme to identical products, Temu has a duty to provide "appropriate support" for, and "evidence to back up," the struck-through Reference Prices and purported percentage discounts advertised on the Temu website when the item sold is the same as that available at other retailers.

46.    In such cases, Defendant has a duty to verify that Reference Prices advertised on its website do not "appreciably exceed the price at which substantial sales" of products identical to its products have been made in its area of trade.

47.    Defendant does not have such evidence and has not in fact verified that its Reference Prices do not "appreciably exceed the price at which substantial sales" of products identical to its products have been made in its area of trade. *See* 16 C.F.R. § 233.2(a).

**c) The Law Regarding Advertising Comparisons to the Pricing of Similar Products**

48.    In a related situation—where an advertiser's comparison price is purportedly based on prices being charged for similar or "comparable" products—the FTC Pricing Guides require that the advertiser make "clear to the consumer that a comparison is being made with other merchandise and the other merchandise is, in fact, of essentially similar quality and obtainable in the area." In such a case, "The advertiser should, however, be reasonably certain, just as in the case of comparisons involving the same merchandise, that the price advertised as being the price of comparable merchandise does not exceed the price at which such merchandise is being offered by representative retail outlets in the area." 16 C.F.R. § 233.2(c).

49.    If Defendant is advancing a comparative pricing scheme to products like its own, then it has a legal obligation to verify with reasonable certainty that the items were indeed of "essentially similar quality" and that each item's Reference Price did not exceed the price at which the item was being listed in representative retail outlets.

50.    Defendant does not have such evidence and does not in fact verify with reasonable certainty that its Reference Prices do not exceed the price at which comparable merchandise was being advertised in representative retail outlets.

**d) The Law Regarding Advertising Comparisons To MSRPs**

51.     In cases where an advertiser's comparison price is purportedly based on a MSRP, the FTC Pricing Guides provide as follows:

> Many members of the purchasing public believe that a manufacturer's list price, or suggested retail price, is the price at which an article is generally sold. Therefore, if a reduction from this price is advertised, many people will believe that they are being offered a genuine bargain. To the extent that the list or suggested retail prices do not in fact correspond to prices at which a substantial number of sales of the article in question are made, the advertisement of a reduction may mislead the consumer.
>
> …
>
> [T]he widespread failure to observe manufacturers' suggested or list prices, and the advent of retail discounting on a wide scale, have seriously undermined the dependability of list prices as indicators of the exact prices at which articles are in fact generally sold at retail. . . . Today, only in the rare case are all sales of an article at the manufacturer's suggested retail or list price.

16 C.F.R. §233.3(a), (c).

52.     According to the FTC Pricing Guides, an advertised MSRP:

> [W]ill not be deemed fictitious if it is the price at which substantial (that is, not isolated or insignificant) sales are made in the advertiser's trade area (the area in which he does business). Conversely, if the list price is significantly in excess of the highest price at which substantial sales in the trade area are made, there is a clear and serious danger of the consumer being misled by an advertised reduction from this price.
>
> . . .
>
> [B]efore advertising a manufacturer's list price as a basis for comparison with his own lower price, the retailer should ascertain whether the list price is in fact the price regularly charged by principal outlets in his area.

16 C.F.R. § 233.3(d), (e).

53.     If Defendant is asserting that its Reference Prices are MSRPs for its products, then it has a legal obligation to verify with reasonable certainty that each price asserted by the manufacturer to Temu was indeed a price at which a substantial

number of sales of that product were made and that the asserted MSRP was a price regularly charged for that product by principal outlets.

54.    Defendant does not have such evidence and does not in fact verify with reasonable certainty that it uses asserted MRRPs as Reference Prices and that these prices were indeed prices at which a substantial number of sales had been made.

**e) Temu Was Not Relieved of its Duty to Verify Prices**

55.    No matter what Defendant's Reference Prices allegedly represent, the fact that Defendant operates Temu as a multinational online retailer does not relieve Defendant of its obligations to set non-fictious reference prices under the FTC Guides. The principles of the FTC Guides continue to control even when selling at such a scale. *See, e.g., id*. ("This general principle applies whether the advertiser is a national or regional manufacturer (or other non-retail distributor), a mail-order or catalog distributor who deals directly with the consuming public, or a local retailer.").

56.    For national distributors, while the Guides acknowledge that such a seller cannot be required to "investigate in detail the prevailing prices of his articles throughout so large a trade area," a seller opens itself to charges of deceptive practices when it fails to advertise or disseminate "a list or preticketed price in good faith (*i.e.*, as an honest estimate of the actual retail price) ***which does not appreciably exceed the highest price at which substantial sales are made in [its] trade area*a[.]**" 16 C.F.R. § 233(g)(emphasis added).

57.    Illustrating the guidance above, the FTC describes the following as "good faith" reference pricing on the part of a national retailer:

> Manufacturer Roe, who makes Brand X pens and sells them throughout the United States, advertises his pen in a national magazine as having a "Suggested Retail Price $10," a price determined on the basis of a market survey. ***In a substantial number of representative communities, the principal retail outlets are selling the product at this price in the regular course of business and in substantial volume.*** Roe would not be considered to have advertised a fictitious "suggested retail price." If

retailer Doe does business in one of these communities, he would not be guilty of a deceptive practice by advertising, "Brand X Pens, Manufacturer's Suggested Retail Price, $10, Our Price, $7.50."

16 C.F.R. § 233(h) (emphasis added).

58.    As such, Defendant has a duty to verify that its struck-through Reference Prices reflect prices at which its products have been sold in a substantial volume across a substantial number of representative communities.

**Defendant's Reference Prices Are Not Based on Fact**

59.    Defendant has "more than 100 categories of merchandise" and advertises thousands upon thousands of products for sale.

60.    Whether Defendant's struck-through Reference Prices were based on former Temu prices, the price at which other retailers offered identical goods, the price at which other retailers offered similar goods, or MSRPs, Defendant had a good faith obligation to verify the Reference Price asserted for each product Temu advertised.

61.    As alleged above, Defendant does not meet its good faith obligation to make sure that its advertised Reference Prices were lawfully related to actual relevant comparative prices.

62.    Rather, as discussed more fully below, Defendant admittedly routinely uses unverified comparative prices—including pricing provided to Defendant by "merchandise partner[s]"—as comparative Reference Prices for its products. Defendant does not determine whether its displayed Reference Prices are, in good faith, not fictitious or misleading; Defendant undertakes no good faith analysis of its own past prices nor the prices of a substantial volume of the products' sales. Instead Defendant's Reference Prices appreciably exceed the highest price at which substantial sales of products are made in Defendant's area of trade.

63.    Plaintiff is informed and believes, and on that basis alleges, that often Defendant has not determined or verified the prices other merchants charge for the

1  identical products that Defendant sells. Rather, Defendant has used various
2  misleading methods to make up prices that it claims other retailers charge for those
3  products and then claims that its own prices are significantly lower than the struck-
4  through Reference Prices advertised on Temu.

5      64.   Defendant's practice of using unverified Reference Prices, including
6  supposed MSRPs and those purportedly provided to it by "retail partner[s]," was
7  likely to deceive consumers, including Plaintiff, by, among other things,
8  representing that these prices did not, in good faith, appreciably exceed the highest
9  prices that a substantial number of sales were made of these same products across
10  retail markets in a substantial number of communities. Defendant's huge advertised
11  discounts off those implied retail prices make those prices attractive. Defendant's
12  misrepresentations of the struck-through Reference Prices as actual retail prices at
13  which substantial sale of these products had been made in a substantial number of
14  representative communities are deceptive, misleading, unlawful, unfair, and/or
15  fraudulent.

16  **Temu's Struck-Through Reference Prices Are Misleading, Deceptive, and/or**
17  **False**

18      65.   The result of Defendant's ignorance or willful misrepresentation of the
19  accuracy of its Reference Prices, and its failure to verify that accuracy, is that
20  consumers, including Plaintiff, are misled into believing that they are receiving
21  substantial savings on the purchase of products from Temu when compared to prices
22  charged for those same products at other retailers. Plaintiff and other Class Members
23  were misled into paying more for Defendant's products than they would have paid
24  absent the Reference Prices.

25      66.   Plaintiff was presented with the struck-though Reference Prices and the
26  Highlighted Discount values on the items she purchased from Temu. Plaintiff
27  believed, like all reasonable consumers would, that the struck-through Reference
28  Price represented either former Temu prices or the prices at which those products

had been sold in substantial volume across a substantial number of representative communities. The impression created is that these Reference Prices referred to the then prevailing retail prices for the same items—that if she shopped around for those same products, she would likely find them elsewhere at the higher Reference Prices provided by Defendant.

67.    Defendant, however, advertises Reference Prices to give a false sense that consumers are getting a bargain to entice them into making purchases they would not otherwise make.

68.    Had Plaintiff coincidentally clicked the faint "?" icon to the right of the struck-through Reference Price displayed for the items she purchased or been savvy enough to go to Defendant's Terms of Use and scroll halfway through its legalese, she would have found what Temu means when offering its struck-through Reference Prices.

69.    The following pricing disclosure can only be found on some of Defendant's pricing displays on the Temu website. To view the below disclosure, a consumer must click or hover their cursor over a faint "?" icon to the right of the struck-through Reference Price. Only then, will the following disclosure appear:

> Items on Temu.com may display a strikethrough price, which is the manufacturer's suggested retail price for the item, the price provided by the merchandise partners, or the price offered by other retailers at or above that price in the past 90 days.
> The price may not necessarily reflect the product's prevailing market price. ("Four-Part Disclosure")

70.    Additionally, a second, different, and more conclusory pricing disclosure is embedded in the Temu Terms of Use, and is in no way identified on or linked to near the merchandise descriptions or pricing information. Instead, a consumer must either actively enter "Terms of Use" or similar language into the Search Bar on Defendant's website to find the Terms of Use, or, once at Temu.com, navigate to "Support Center," select "Policies," and then select "What is Temu's

terms and conditions policy?" to be taken to a link to the Terms of Use.  Once at the terms, a consumer must scroll down half-way through the Terms of Use to find the following language embedded in section 10.2 of "Pricing":

> You should not rely on the strike-through price in your purchase decision. If comparing prices is important to your purchase decision, you should do your own comparison before making a purchase. ("Terms of Use Disclosure")

**Reasonable Consumers Do Not Interpret Defendant's Struck-Through Reference Prices to Have No Relationship to its Products' Market Prices**

71.    Reasonable consumers, including Plaintiff, do not expect that the advertised Reference Price and highlighted percentage discount displayed by the item's price to "not necessarily" have a relation to the product's "market price." Instead, they expect certainty as to how a Reference Price is determined and expect that that Reference Price has a good faith relationship to a substantial number of sales in the marketplace.

72.    Reasonable consumers, including Plaintiff, would similarly not expect Defendant's Four-Part Disclosure (should they even find that disclosure tucked away under a faint icon next to the bold pricing information) to then be totally abandoned in a contradictory and presumably overriding Terms of Use disclosure buried three layers deep in the Temu webpage. There, despite Defendant's own declaration that its Reference Prices were determined using one of the three methods listed in its Four-Part Disclosure, the Terms of Use advise that Reference Prices should not be relied upon at all.

73.    Defendant's display of pricing information, as described herein, deceptively led consumers, including Plaintiff, to believe that the struck-though Reference Price with the Highlighted Discount information was either a price at which Temu had previously sold the product, or the price at which the product was typically sold in the marketplace, from which Temu offered a discount.

74.    Nowhere in Defendant's overtly displayed pricing information is it made clear to consumers, including Plaintiff, that the advertised struck-though

Reference Price may just be a price that a third-party "merchandise partner" has provided Defendant.

75.    Nowhere in Defendant's overtly displayed pricing information is it made clear to consumers, including Plaintiff, that the advertised struck-through Reference Price may not reflect the item's prevailing market price.

76.    Nowhere in Defendant's overtly displayed pricing information is it made clear to consumers, including Plaintiff, that the advertised struck-though Reference Price may not even be a price at which any retailer ever offered the particular item at any time or location.

77.    Nowhere in Defendant's pricing information are consumers warned or told that they should do their own comparison shopping before relying on the struck-though Reference Price.

78.    Consumers should not have to search all over Defendant's pricing information for hidden, misleading, and ambiguous explanations for what Defendant's clearly displayed price comparison means.

79.    Even if a consumer were to come across the faint "?" icon on an item's pricing display and discover Defendant's stated explanation of its Reference Pricing, it is still not clear from Defendant's disclosure language what the struck-though Reference Price actually relates to.

80.    Based on Defendant's disclosure language, it could well be that a particular item, or even a comparable item, was never offered for sale at the struck-though Reference Price by another retailer, at any time, or in any location.

81.    Plaintiff and all other Class Members reasonably relied upon Defendant's deceptive, misleading, and/or false representations of comparative Reference Prices and false representations of purported savings, discounts, and bargains when purchasing merchandise from Temu.

82.    Therefore, Defendant's hidden disclosures do not get it off the hook.

**No Disclosure Can Obviate Defendant's Obligation to Comply With the Law**

83.     As laid out fully above, per FTC and California law, Defendant has a good faith obligation to verify the Reference Prices for each product sold on the Temu website.

84.     Basic principles of advertising law apply to Defendant: its ads must be truthful and not misleading; it must have evidence to back up its claims; and its advertisements cannot be unfair.

85.     If Defendant's pricing information made express or implied claims that were likely to be misleading without qualifying information, then that information needed to be disclosed.

86.     Importantly here, a disclosure can only serve to qualify or limit a misleading impression—it cannot relieve a seller of an obligation to comply with a legal requirement. Even if artfully crafted, a disclosure cannot cure a false claim. "If a disclosure provides information that contradicts a material claim, the disclosure will not be sufficient to prevent the ad from being deceptive. In that situation, the claim itself must be modified."[20]

87.     Here, Defendant has a legal requirement to verify its Reference Prices.

88.     Reference pricing is material to consumers; an artificially high reference price is able to inflate the price a consumer is willing to pay for an item, even if the reference price is implausibly high.

89.     Defendant's disclosures regarding its Reference Prices directly contradict what such advertised pricing must legally represent—rather than being a good faith indication of the highest price at which Temu previously offered the item for sale or at which a substantial number of sales are made in a substantial number of representative retail communities, Defendant's Reference Pricing admittedly did

---

[20] Fed. Trade Comm'n, *.com Disclosures: How to Make Effective Disclosures in Digital Advertising* (2013), https://www.ftc.gov/system/files/documents/plain-language/bus41-dot-com-disclosures-information-about-online-advertising.pdf at 5.

1  not "necessarily reflect the product's prevailing market price" and was merely a
2  number upon which the consumer should not rely.

3      90.    Thus, Defendant's Reference Pricing was unfair, unlawful, and false.

4      91.    Defendant cannot legally disclose away its legal obligations to Plaintiff
5  and all other Class Members and has engaged in false, misleading, and/or deceptive
6  advertising.

7  **Even if Temu Could Cure Its Misleading Reference Prices with a Disclosure,**
8  **Temu's Attempts At Disclosure Fail**

9      92.    Defendant attempts to cure its unfair, unlawful, and false Reference
10 Prices with disclosures. If an ad makes express or implied claims that are likely to
11 be misleading without qualifying information, that information must be disclosed.
12 *Id.*    Here, since Defendant interprets their Reference Pricing in a way that a
13 reasonable consumer would not understand, they had a duty to Plaintiff and all other
14 Class Members to adequately disclose this interpretation.

15     93.    Reasonable consumers do not expect a Reference Price to not
16 necessarily reflect the product's prevailing market price. Thus, if Defendant's
17 Reference Pricing misrepresentations were curable, Defendant had a duty to
18 appropriately and conspicuously disclose that understanding to Plaintiff and all other
19 Class Members.

20     94.    When Defendant provides the above multi-part ambiguous and
21 confusing disclosure (which it does not do for all items), it is hidden as a pop-up
22 under a faint "?" icon next to the bold orange display of the item's purported
23 Highlighted Discount. A consumer would have to see that faint icon, identify it as
24 meaningful against the barrage of proffered pricing information, and then click or
25 hover a cursor over the icon to reveal the purported disclosure.

26     95.    Moreover, when a Temu item is accessed through a Google search, the
27 product listing is missing that "?" icon with its pop-up disclosure language entirely.

28

CLASS ACTION COMPLAINT

96. Then, adding to the confusion, Defendant's multi-part pricing disclosure frequently, although not always, provided under the "?" icon is contradicted by a different disclosure buried three layers deep on Defendant's website. That second disclosure advises that Defendant's Reference Prices should not be relied upon at all.

97. While Defendant has provided disclosures that attempt to qualify its pricing information, one set of disclosures is ambiguous, while the other contradicts the first, and neither are clearly and conspicuously displayed as required by FTC rules.

98. In purchasing merchandise at Defendant's online store and through its App, Plaintiff and other Class Members reasonably and justifiably acted and relied to their detriment on Defendant's deceptive comparative prices.

**Defendant's Disclosures Do Not Comply with FTC Guidelines**

99. The FTC provides detailed requirements to online retailers concerning the use of purported disclosures in its ".com Disclosures" rules. Fed. Trade Comm'n, *.com Disclosures: How to Make Effective Disclosures in Digital Advertising* (2013).[21]

---

[21] https://www.ftc.gov/system/files/documents/plain-language/bus41-dot-com-disclosures-information-about-online-advertising.pdf.

100.   Defendant's attempts to disclose its definition or interpretation of its struck-through Reference Pricing on its website are subject to the FTC's ".com Disclosures" rules.

101.   The FTC has a "clear and conspicuous requirement" for advertising disclosures made online. Depending on the nature of the ad and, in this case, relevant to Defendant's advertisement, advertisers must consider: the placement of the disclosure in the advertisement and its proximity to the claim it is qualifying (here, the Reference Price); the prominence of the disclosure; the extent to which items in other parts of the advertisement might distract attention from the disclosure; and whether the language of the disclosure is understandable to the intended audience. *Id.* at 7.

102.   Considering first proximity and placement, a disclosure is most effective if it is placed near the claim it qualifies ("the triggering claim"). Recognizing that this can be a challenge for small screens, the FTC clarifies that hyperlinks can be used if the information disclosed is not an integral part of the claim, *e.g.*, not related to the basic cost of the item or health and safety information. *Id.* at 8-10.

103.   If a hyperlink is used to address the proximity and placement requirement, the link should be "clearly labeled to communicate the specific nature of the information to which it leads, *e.g.*, 'Service plan required. Get service plan prices.'" *Id.* at 10-11. Important considerations for evaluating the effectiveness of a hyperlinked disclosure include: the labeling of the hyperlink, the consistency of use of hyperlink styles, the placement and prominence of the hyperlink on the screen, and the handling of the disclosure on the click-through screen. *Id.* at 11.

104.   The FTC Guides regarding labeling hyperlinks are clear:

   A. The link should obviously be a hyperlink, *e.g.*, using multiple methods of identifying it such as an underscore and color.

B. The link should be labeled to convey its importance and nature, *i.e.*, it should use clear and understandable text related to the advertising claim in question, *e.g.*, "click for pricing information."

C. The text link should indicate why a claim is qualified or the nature of the disclosure.

D. The link should not be subtle; "[s]ymbols or icons by themselves are not likely to be effective as hyperlink labels leading to disclosures that are necessary to prevent deception."

E. Hyperlinks should account for technological differences and limitations. *Id.* at 11-12.

105. Regarding the prominence of a disclosure, it is the advertiser's responsibility to make it noticeable to the consumer. Disclosures are most effective when they are at least as large as the claim to which they relate. Similarly, disclosures in a color that contrast with the background emphasize the text of the disclosure and makes it more noticeable. They should not "blend in." *Id.* at 17.

106. Distracting factors in the ad itself must be considered when evaluating whether a disclosure is clear and conspicuous. "Elements like graphics, text, links that lead to other screens or sites, or 'add to cart' buttons may result in consumers not noticing, reading, or listening to the disclosure." *Id.* at 19.

107. Finally, under the FTC Guides, disclosures must be understandable to be effective. "Advertisers should use clear language and syntax and avoid legalese or technical jargon. Disclosures should be as simple and straightforward as possible." *Id.* at 21.

108. Defendant's attempted disclosures fail the FTC's "clear and conspicuous" requirement at nearly every turn. Looking first at the disclosure found in Temu's Terms of Use, it is nowhere near the triggering claim it seeks to qualify—the item's Reference Price. There is absolutely no text near the pricing saying that the Reference Price cannot be relied upon and that consumers should do their own

price research. There is no such text anywhere on the pricing page.  Nor is there a hyperlink directing consumers straight to the Terms of Use Disclosure. Rather, the Terms of Use Disclosure is buried deep within Temu's website and not referred to or linked to at all in any item or pricing descriptions. A reasonable consumer would not know that the disclaimer existed, much less how to find it. In the language of the FTC Guide, the ball is completely hidden.

109.   Defendant's Four-Part Disclosure for Reference Prices similarly spectacularly fails the FTC's "clear and conspicuous" analysis. This disclosure can be found hidden on some of the Temu pricing displays if one goes directly to Temu.com. To locate the disclosure, a consumer must hover their cursor over a faint "?" icon to the right of the struck-through Reference Price. Only then will the disclosure pop up.

110.   When the "?" icon appears, it is close to the Reference Price. However, under the FTC Guides, this icon is not effectively labeled as a hyperlink: there is no text communicating the nature of the hyperlink (*i.e.*, that it is a disclosure regarding pricing); the link does not use underlined text or a different color to identify it as a hyperlink; only an icon is used; and technological differences and limitations have not been taken into account as the "?" icon does not appear if the item is located through a Google search.

111.   The prominence of the Four-Part Disclosure fails as the size of the "?" icon in Defendant's product displays is small compared to the pricing information and is a pale gray against the white background. In contrast, Defendant's pricing information and percentage discounts are in bright orange. The "?" is subtle and completely blends into the background of the product displays.

112.   The above fact is exacerbated by the distracting nature of Defendant's product displays themselves. Using the product display for the shorts purchased by Plaintiff as an example, the small screen display is awash with colorful information about the item: "Lowest price in 30 days," "Free shipping on all orders," "Exclusive

Offer," "4.9K+ sold," 4.8 out of 5 stars, "$8.99," "Pay $2.24 today," "-85%," "$63.99," "4 interest-free biweekly installments." Almost all information is in text larger than the "?" icon, and half of the pricing information, including the assumed percentage off discount, is in orange. It is nearly impossible to notice the faint, gray, small "?" against this distracting visual noise.

113.    Finally, the Four-Part Disclosure is anything but simple and straightforward. According to this disclosure, Defendant's struck-through Reference Price could be a MSRP, or it could be a price provided to Defendant by a "retail partner," or it could be a price that the item was offered for sale by other retailers "at or above that price" in the last 90 days, or it may not necessarily reflect the product's "prevailing market price." It is completely ambiguous and awash with legalese.

114.    Even if Defendant could disclose away its false pricing claims, both Defendant's Terms of Use Disclosure and the Four-Part Disclosure fail to meet the FTC's requirements and are neither clear nor conspicuous.

## CLASS ACTION ALLEGATIONS

115.    Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on behalf of herself and all other similarly situated individuals (the "Class"), defined as follows:

> All persons who, while in the State of California, purchased one or more products from Defendant's Temu website that were represented as discounted from a higher struck-through reference price from the period of February 24, 2020 to the present (the "Class Period") and who have not received a refund or credit for their purchase(s).

116.    Excluded from the Class are Defendant, as well as its officers, directors, or employees; officers, directors, or employees of any entity in which Defendant currently has or has had a controlling interest; and Defendant's legal representatives, heirs, successors, and assigns.

117.    Plaintiff reserves the right to expand, limit, modify, or amend this class definition, including the addition of one or more subclasses, in connection with her

1  motion for class certification, or at any other time, based upon, among other things,

2  changing circumstances and/or new facts obtained during discovery.

3    118.  The Class members are so numerous that joinder of all members is

4  impracticable. Plaintiff is informed and believes that the proposed Class contains

5  hundreds of thousands of individuals who have been damaged by Defendant's

6  conduct as alleged herein. The precise number of Class members is unknown to

7  Plaintiff.

8    119.  Each member of the proposed Class herein has been exposed to

9  Defendant's false and/or misleading pricing and advertising scheme.  Each item that

10  each Class Member purchased from Defendant throughout the Class Period has been

11  accompanied by the false, deceptive, and/or misleading comparative reference price

12  advertising described herein.

13    120.  Common questions of law and/or fact exist in this case with respect to

14  the proposed Class, which predominate over any questions affecting individual

15  members of the Class. The common questions of law and/or fact include, but are not

16  limited to, the following:

17      1. Whether, during the Class Period, Defendant used false reference

18        price representations and falsely advertised price discounts for their

19        merchandise;

20      2. Whether, during the Class Period, the reference prices advertised by

21        Defendant were the prevailing market prices for the respective

22        merchandise sold by Defendant during the three-month period

23        preceding the dissemination and/or publication of the advertised

24        former prices and did not appreciably exceed the highest price at

25        which substantial sales of those products were made in its trade area;

26      3. Whether Defendant's use of the price advertising scheme described

27        herein constituted false advertising under California law;

28      4. Whether Defendant engaged in unfair, unlawful, and/or fraudulent

business practices under California law;

5. Whether Defendant misrepresented and/or failed to disclose material facts about its product pricing and discounts;

6. Whether Plaintiff and Class members are entitled to damages and/or restitution and the proper measure of that loss;

7. Whether Defendant continues to use false, misleading, and/or illegal price comparisons such that an injunction is necessary.

121. Plaintiff's claims are typical of the claims of the Class members because Plaintiff, like all Class members, was deceived by Defendant's false and deceptive price advertising scheme, as alleged herein, in a typical consumer setting and sustained damages from Defendant's wrongful conduct.

122. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in litigating complex class actions. Plaintiff has no interests that conflict with those of the Class.

123. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

124. The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met, as Defendant has acted or refused to act on grounds that apply generally to the Class so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole.

125. Defendant's conduct is generally applicable to the Class as a whole and Plaintiff seeks, *inter alia*, equitable remedies with respect to the Class as a whole. As such, Defendant's systematic practices make declaratory relief with respect to the Class as a whole appropriate.

126. The requirements of Fed. R. Civ. P. 23(b)(3) are met as common issues predominate over any individual issues, and treatment of this matter as a class action is superior to numerous individual actions.

127.   The litigation of separate actions by Class members would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Temu. For example, one court might enjoin Temu from performing the challenged acts, whereas another might not. Additionally, individual actions may be dispositive of the interests of the Class, although certain Class members are not parties to such actions.

## FIRST CAUSE OF ACTION

### Violation of California's Unfair Competition Law ("UCL")

### California Business and Professions Code § 17200, *et seq*.

128.   Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

129.   The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200.

130.   The UCL imposes strict liability.   Plaintiff need not prove that Defendant intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

*"Unfair" Prong*

131. A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

132. Defendant's actions constitute "unfair" business practices because, as alleged above, Temu engaged in misleading and deceptive price advertising that represented false advertised Reference Prices and corresponding deeply discounted prices. The discounts were nothing more than fabricated advertised Reference Prices resulting in phantom comparisons and markdowns. Defendant's acts and practices

offended an established public policy of transparency in pricing, and engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

133. The harm to Plaintiff and Class members outweighs the utility of Defendant's practices. There were reasonably available alternatives to further Defendant's legitimate business interests other than the misleading and deceptive conduct described herein.

*"Fraudulent" Prong*

134. A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

135. Defendant's acts and practices alleged above constitute fraudulent business acts or practices as it has deceived Plaintiff and is highly likely to deceive members of the consuming public. Plaintiff relied on Defendant's fraudulent and deceptive representations regarding its struck-through Reference Prices for products which Temu sells on its e-commerce retail store and App. These misrepresentations played a substantial role in Plaintiff's decision to purchase those products at steep discounts, and Plaintiff would not have purchased those products without Defendant's misrepresentations.

*"Unlawful" Prong*

136. A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

137. Defendant's acts and practices alleged above constitute unlawful business acts or practices as Defendant has violated state and federal law in connection with its deceptive pricing scheme. The Federal Trade Commission's Act ("FTCA") prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and prohibits the dissemination of any false advertisements. 15 U.S.C. § 52(a). Under the Federal Trade Commission, false former pricing schemes, are described as deceptive practices that would violate the FTCA:

(a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious – ***for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction – the "bargain" being advertised is a false one***; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price.

(b) A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of her business, honestly and in good faith – and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based.

16 C.F.R. § 233.1(a) and (b) (emphasis added).

138. In addition to federal law, California law also expressly prohibits false former pricing schemes. California's FAL, Bus. & Prof. Code §17501, entitled "*Worth or value; statements as to former price*," states:

For the purpose of this article the worth or value of anything advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published. ***No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement*** or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

Cal. Bus. & Prof. Code § 17501 (emphasis added).

139.  Similar to false former pricing schemes, the FTC prohibits improperly advertising retail prices that have been established or suggested by manufacturers or other nonretail distributors:

> (a) Many members of the purchasing public believe that a manufacturer's list price, or suggested retail price, is the price at which an article is generally sold. Therefore, if a reduction from this price is advertised, many people will believe that they are being offered a genuine bargain. To the extent that list or suggested retail prices do not in fact correspond to prices at which a substantial number of sales of the article in question are made, the advertisement of a reduction may mislead the consumer.
> …
> (d) [A list price] will not be deemed fictitious if it is the price at which substantial (that is, not isolated or insignificant) sales are made in the advertiser's trade area (the area in which he does business). Conversely, *__if the list price is significantly in excess of the highest price at which substantial sales in the trade area are made, there is a clear and serious danger of the consumer being misled by an advertised reduction from this price.__*
> (**e**) This general principle applies whether the advertiser is a national or regional manufacturer (or other non-retail distributor), a mail-order or catalog distributor who deals directly with the consuming public, or a local retailer. But certain differences in the responsibility of these various types of businessmen should be noted. …
> (**g**) [A] manufacturer or other distributor who does business on a large regional or national scale cannot be required to police or investigate in detail the prevailing prices of his articles throughout so large a trade area. *__If he advertises or disseminates a list or preticketed price in good faith (i.e., as an honest estimate of the actual retail price) which does not appreciably exceed the highest price at which substantial sales are made in his trade area, he will not be chargeable with having engaged in a deceptive practice.__*

16 C.F.R. § 233.3(a), (d), (e), and (g) (emphasis added).

140.  As detailed in Plaintiff's Third Cause of Action below, the CLRA, Cal. Civ. Code § 1770(a)(9), prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," and subsection (a)(13) prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions."

141. The violation of any law constitutes an "unlawful" business practice under the UCL.

142. As detailed herein, the acts and practices alleged were intended to or did result in violations of the FTCA, the FAL, and the CLRA.

143. Defendant's practices, as set forth above, have misled Plaintiff, the proposed Class, and the public in the past and will continue to mislead in the future. Consequently, Defendant's practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

144. Pursuant to the UCL, Plaintiff and the Class are entitled to disgorgement and restitution of all of Defendant's revenues associated with its unfair competition, or such portion of those revenues as the Court may find equitable.

## **SECOND CAUSE OF ACTION**

### **Violation of California's False Advertising Law ("FAL")**

### **California Business & Professions Code § 17500,** *et seq.*

145. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

146. Cal. Bus. & Prof. Code § 17500 provides:

> It is unlawful for any…corporation…with intent…to dispose of…personal property…to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated…from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement…which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading…"

147. The "intent" required by Section 17500 is the intent to dispose of property, and not the intent to mislead the public in the disposition of such property.

148. Similarly, Cal Bus. & Prof. Code § 17501 provides, "no price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price…within three months next immediately preceding the

1  publication of the advertisement or unless the date when the alleged former price

2  did prevail is clearly, exactly, conspicuously stated in the advertisement."

3      149. Defendant's routine of advertising discounted prices from false

4  advertised Reference Prices, which were never the prevailing market prices of those

5  products and were materially greater than the true prevailing prices, is an unfair,

6  untrue, and misleading practice. This deceptive marketing practice gives consumers

7  the false impression that the products are regularly sold on the market for a

8  substantially higher price than they actually were, therefore, leading to the false

9  impression that the products sold on Defendant's website are worth more than

10 they actually are.

11     150. Defendant misled consumers by making untrue and misleading

12 statements and failing to disclose what is required as stated in the Code alleged above.

13     151. As a direct and proximate result of Defendant's misleading and false

14 advertisements, Plaintiff and Class members have suffered injury in fact and have

15 lost money. As such, Plaintiff requests that this Court order Temu to restore this

16 money to Plaintiff and all Class members.

17                    **THIRD CAUSE OF ACTION**

18      **Violation of California's Consumers Legal Remedies Act ("CLRA"),**

19           **California Civil Code § 1750, *et seq*.**

20     152. Plaintiff repeats and re-alleges the allegations contained in every

21 preceding paragraph as if fully set forth herein.

22     153. This cause of action is brought pursuant to the CLRA, Cal. Civ. Code §

23 1750, *et seq*. Plaintiff and each member of the proposed Class are "consumers" as

24 defined by Cal. Civ. Code § 1761(d). Defendant's sale of merchandise website to

25 Plaintiff and the Class are "transactions" within the meaning of Cal. Civ. Code §

26 1761(e). The products purchased by Plaintiff and the Class are "goods" within the

27 meaning of Cal. Civ. Code § 1761(a).

28

154. Defendant violated and continues to violate the CLRA by engaging in the following practices proscribed by Cal. Civ. Code § 1770(a) in transactions with Plaintiff and the Class which were intended to result in, and did result in, the sale of merchandise sold on its e-commerce retail store and App:

   a.   Advertising goods or services with intent not to sell them as advertised; (a)(9);

   b.   Making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions; (a)(13).

155. Pursuant to § 1782(a) of the CLRA, on May 3, 2024, Plaintiff's counsel notified Defendant in writing by certified mail of the particular violations of § 1770 of the CLRA and demanded that it rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to act.

156. If the 30-day notice period passes without Temu remedying its misconduct, Plaintiff will amend this Complaint to include claims for actual, punitive, and statutory damages as appropriate under Cal. Civ. Code § 1770, *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, prays for judgment against Defendant as follows:

(a)   Certifying this action as a class action, appointing Plaintiff as the Class representative, and designating the undersigned as Class counsel;

(b)   A declaration that Defendant is financially responsible for notifying Class members of the pendency of this suit;

(c)   A judgment awarding Plaintiff and all Class members restitution and/or other equitable relief, including, without limitation, restitutionary disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class as a result of the unlawful, unfair and/or fraudulent business practices described herein;

(d)    A judgment awarding Plaintiff and the Class damages under common law and/or by statute, and punitive damages;

(e)    An order enjoining Defendant from continuing to violate the UCL and/or FAL and/or CLRA as described herein, and/or an order enjoying Defendant from violating the UCL and/or FAL and/or CLRA in the future;

(f)    Additional awards of up to $5,000 for physical, emotional, or economic damage for all senior citizen and disabled Class Members, pursuant to California Civil Code § 1780(b)(1);

(g)    A judgment awarding Plaintiff and Class members their costs of suit, including reasonable attorneys' fees pursuant to Code of Civil Procedure § 1021.5 and as otherwise permitted by statute or law, and pre- and post-judgment interest; and

(h)    Granting such other and further relief as this Court may deem just and proper.

Respectfully submitted,

Date: May 28, 2024

**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES, LLP**

By: _ /s/ Helen I. Zeldes_

Helen I. Zeldes, Esq. (SBN 220051)
*hzeldes@sshhzlaw.com*
Amy C. Johnsgard, Esq. (SBN 279795)
*ajohnsgard@sshhzlaw.com*
Aya Dardari (SBN 344039)
*adardari@sshhzlaw.com*
501 West Broadway, Suite 800
San Diego, California 92101
Telephone: (619) 400-4990

Joshua A. Fields (SBN 242938)
*jfields@sshhzlaw.com*
9415 Culver Blvd., #115
Culver City, CA 90232-2616
Tel: (619) 400-4990

*Counsel for Plaintiff Kristen Kohler.*
*and the Proposed Class.*

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiff hereby demand a trial by jury for all claims so triable.

3

4

Respectfully submitted,

5

Date: May 28, 2024                **SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES, LLP**

6

7

By: _/s/ Helen I. Zeldes_____
Helen I. Zeldes, Esq. (SBN 220051)

8

*hzeldes@sshhzlaw.com*
Amy C. Johnsgard, Esq. (SBN 279795)

9

*ajohnsgard@sshhzlaw.com*
Aya Dardari (SBN 344039)

10

*adardari@sshhzlaw.com*
501 West Broadway, Suite 800

11

San Diego, California 92101
Telephone: (619) 400-4990

12

13

Joshua A. Fields (SBN 242938)
*jfields@sshhzlaw.com*

14

9415 Culver Blvd., #115
Culver City, CA 90232-2616

15

Tel: (619) 400-4990

16

*Counsel for Plaintiff Kristen Kohler.
and the Proposed Class.*

17

18

19

20

21

22

23

24

25

26

27

28